## GOUDY *v.* MEATH.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 53.    Submitted October 23, 1906.—Decided November 19, 1906.

Where a State by statute makes the allotted lands of Indians alienable the same as lands of citizens, and Congress by statute postpones the operation of the state statute for a definite period, when that period has expired all restriction upon alienation both voluntary and involuntary by operation of law, such as taxation and levy and sale thereunder, ceases.

Although Congress may by statute give Indians a right of voluntary alienation of allotted lands but exempt such lands from levy, sale and forfeiture, such an exemption cannot exist by implication but must be clearly manifested.

By the act of February 8, 1887, allottee Indians became citizens and their property, unless clearly exempted by statute, is subject to taxation in the same manner as that of other citizens.

38 Washington, 126, affirmed.

THIS case is before us on error to the Supreme Court of Washington. 38 Washington, 126. It was submitted to the state courts on an agreed statement of facts and involves the question of the liability of the land of the plaintiff, now plaintiff in error, to taxation for the year 1904. He is a Puyallup Indian, and claims exemption under and by virtue of the treaty of December 26, 1854. 10 Stat. 1132. That treaty provided for an allotment of land in severalty to such members of the tribe as were willing to avail themselves of the privilege, on the same terms and subject to the same regulations as were named in the treaty with the Omahas.

The latter treaty, March 16, 1854, 10 Stat. 1043, authorized the President to issue a patent for any allotted land, " conditioned that the tract shall not be aliened, or leased for a longer term than two years; and shall be exempt from levy, sale or forfeiture, which conditions shall continue in force until the state constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the State. shall remove the restrictions. . . . No state legislature shall remove the restrictions herein provided for, without the consent of Congress." Under this treaty, on January 30, 1886, a patent to the plaintiff was issued. One of the facts agreed upon is the following:

"That since the issuance of said patent, and by an act of Congress passed and approved on the eighth day of February, 1887, plaintiff became and now is a citizen of the United States, and entitled to all the rights, privileges and immunities of such citizens. Said act is found in the United States Statutes at Large, vol. 24, chapter 119, at page 388."

In 1889, Washington was admitted as a State. Its first legislature enacted:

"SECTION. 1. That the said Indians who now hold, or who may hereafter hold, any of the lands of any reservation, in severalty, located in this State, by virtue of treaties made between them and the United States, shall have power to lease, incumber, grant and alien the same in like manner and with like effect as any other person may do under the laws of the United States and of this State, and all restrictions in reference thereto are hereby removed." Laws 1889–90, p. 362.

In 1893, Congress passed an act, 27 Stat. 612, 633, authorizing the appointment of a commission with power to superintend the sale of the allotted lands, with this proviso:

"That the Indian allottees shall not have power of alienation of the allotted lands not selected for sale by said commission for a period of ten years from the date of the passage of this act."

Construing these several acts, the Secretary of the Interior,

on February 14, 1903, wrote to the Commissioner of Indian Affairs, summing up his conclusions in these words:

"I am of the opinion that the requirements of the treaties with respect to these lands have been fully met, and that the provisions of the act of the legislature of the State of Washington of March 22, 1890, and the Indian appropriation act of March 3, 1893, referred to above, together operate to remove all restrictions upon the alienation or sale thereof by the allottees. I have therefore to direct that the Puyallup commissioner be instructed to continue the selection and appraisement of such portions of the Puyallup allotted lands, *but only with the consent of the Indians,* as provided in the act of March 3, 1893—until the expiration of the ten-year period mentioned, to wit, March 3, 1903, after which date, in my judgment, the Puyallup Indian allottees will ' have power to lease, incumber, grant, and alien the same in like manner and like effect as any other person may do under the laws of the United States, and of' the State of Washington.

"You are further directed to instruct the commissioner to take the necessary steps to complete and close up the business of his office as soon as practicable after March 3, next."

*Mr. Walter Christian* for plaintiff in error.

*Mr. Charles O. Bates* and *Mr. Walter M. Harvey* for defendant in error.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

In the brief filed by the plaintiff in error no question is made of his right to sell and convey the land. The Supreme Court of the State, in its opinion, says: "It is conceded that the Indians may now sell their lands voluntarily and convey a title in fee, and that thereupon the lands so sold are subject to taxation in the hands of parties not Indians." But the contention is that although he has the power of voluntary sale

and conveyance, yet until he has exercised that power the land is not subject to taxation or forced sale. His argument rests mainly upon the contention that there is no express repeal of the exemption, provided in the original treaty, "from levy, sale or forfeiture." That Congress may grant the power of voluntary sale, while withholding the land from taxation or forced alienation, may be conceded. For illustration, see treaty of January 31, 1855, with the Wyandotts, 10 Stat. 1159, 1161. But while Congress may make such provision, its intent to do so should be clearly manifested, for the purpose of the restriction upon voluntary alienation is protection of the Indian from the cunning and rapacity of his white neighbors, and it would seem strange to withdraw this protection and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it from taxation. In other words, that the officers of a State enforcing its laws cannot be trusted to do justice, although each and every individual acting for himself may be so trusted.

But further, by the act of February 8, 1887, plaintiff became and is a citizen of the United States. That act, in addition to the grant of citizenship, provided that "Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." *Matter of Heff*, 197 U. S. 488.

Among the laws to which the plaintiff as a citizen became subject were those in respect to taxation. His property, unless exempt, became subject to taxation in the same manner as property belonging to other citizens, and the rule of exemption for him must be the same as for other citizens—that is, that no exemption exists by implication but must be clearly manifested. No exemption is clearly shown by the legislation in respect to these Indian lands. The original treaty provided that they should be exempt from levy, sale or forfeiture until the legislature of the State should, with the consent of Congress, remove the restriction. This, of course,

meant involuntary as well as voluntary alienation. When the State was admitted and its constitution formed, its legislature granted the power of alienation "in like manner and with like effect as any other person may do under the laws of the United States and of this State, and all restrictions in reference thereto are hereby removed." What restrictions? Evidently those upon alienation. The Indian may not only voluntarily convey his land (authority to do that is provided by the use of the word "grant"), but he may also permit its alienation by any action or omission which in due course of law results in forced sale. Congress postponed the operation of this statute for ten years. When the ten years expired (and they had expired before this tax was attempted to be levied) all restriction upon alienation ceased. It requires a technical and narrow construction to hold that involuntary alienation continues to be forbidden while the power of voluntary alienation is granted; and it is disregarding the act of Congress to hold that the Indian, having property, is not subject to taxation when he is subject to all the laws, civil and criminal, of the State.

We see no error in the ruling of the Supreme Court of the State of Washington, and its judgment is

*Affirmed.*